**IN THE UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

---------------------------------------------------------------

|  |  |  |
|---|---|---|
|  | x |  |
|  | : | **Chapter 11** |
| **In re:** | : |  |
|  | : | **Case No. 09-11091 (CSS)** |
| **VERMILLION, INC.,** | : |  |
|  | : |  |
| **Reorganized Debtor.** | : |  |
|  | : | Hearing Date: 3/2/2010 @ 11:00 a.m. (EST) |
|  |  | (Scheduling Only) |
|  | x |  |

---------------------------------------------------------------

### MOTION OF THE REORGANIZED DEBTOR BY AND THROUGH THE SPECIAL COMMITTEE FOR AN ORDER AUTHORIZING A REDUCED DISTRIBUTION UNDER THE MANAGEMENT INCENTIVE PLAN

The above-captioned reorganized debtor (the "Debtor" or the "Company"), by and through the Special Committee of the Board of Directors (the "Special Committee"), hereby moves the Court for entry of an order, pursuant to sections 105(a) and 363(b) of title 11 of the United States Code (the "Bankruptcy Code") and Rule 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), authorizing distribution of certain Incentive Plan Payments[1] in the reduced aggregate amount of $7.5 million in cash and $7.5 million in restricted stock to the Incentive Plan Participants. In support of this Motion, the Special Committee incorporates the Debtor's Motion for Entry of an Order Approving the Debtor's Incentive Plan and Authorizing Payments Thereunder Pursuant to §§ 363(b) and 503(b) of the Bankruptcy Code [Docket No. 29] (the "Incentive Plan Motion"), the Order Approving Debtor's Motion for Entry of an Order Approving the Debtor's Incentive Plan and Authorizing Payments Thereunder Pursuant to §§ 363(b) and 503(b) of the Bankruptcy Code [Docket No. 72] (the "Incentive Plan

---

[1] Capitalized terms used herein and not otherwise defined shall have the meanings given to them in the Debtor's Motion for Entry of an Order Approving the Debtor's Incentive Plan and Authorizing Payments Thereunder Pursuant to §§ 363(b) and 503(b) of the Bankruptcy Code [Docket No. 29].

<u>Order</u>") and the Preliminary Statement of the Reorganized Debtor Regarding Formation of a Special Committee to Evaluate Distributions under the Management Incentive Plan [Docket No. 303] (the "<u>Preliminary Statement</u>") and respectfully represents as follows:

## Background

**The Debtor's Chapter 11 Cases**

1.      On March 30, 2009 (the "<u>Petition Date</u>"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (the "<u>Bankruptcy Case</u>"). The Debtor was authorized to continue to operate its business and manage its properties as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. On May 4, 2009, the Office of the United States Trustee (the "<u>Trustee</u>") appointed an Official Committee of Unsecured Creditors in the Bankruptcy Case (the "<u>Committee</u>"). On the eve of the hearing on the Debtor's Disclosure Statement, an Official Committee of Equity Security Holders (the "<u>Equity Committee</u>") was formed.

2.      At this point, the Court is very familiar with the Debtor's business operations, its highly successful emergence from chapter 11 earlier this year and the issues surrounding the Incentive Plan Order, which are set forth in more detail in the Preliminary Statement. By way of relevant background, however, on April 21, 2009, the Debtor filed the Incentive Plan Motion, which sought to provide proper incentives to the Incentive Plan Participants so that they could use their "substantial experience and institutional knowledge" to help achieve a successful sale or restructuring of the Debtor. (Incentive Plan Motion ¶ 9). Following extensive negotiations with the Committee and Quest Diagnostics, Inc., at the hearing on June 22, 2009, the Court entered the Incentive Plan Order, approving the Incentive Plan Motion.

3.      Following extensive negotiation in the wake of the FDA's approval of the OVA-1 test, the Court entered an order confirming the Debtor's First Amended Plan of Reorganization

(the "Plan") on January 7, 2010. The Plan, which did not receive a single "no" vote, paid all creditors in full and reinstated all equity, which at confirmation had a value in excess of $225 million.

4.      And, as the Court is also aware, while the Incentive Plan Order provided the Debtor with the authority to make the Incentive Plan Payments, the Debtor, out of an abundance of caution, agreed to seek final approval of any such payments with the Court. At this point, in addition to the Court's comments on this issue, the Debtor is aware that only the Equity Committee has raised concerns with the Incentive Plan Payments.

5.      On February 12, 2010, the Reorganized Debtor filed the Preliminary Statement, which apprised the Court that the Special Committee had been formed to evaluate fully the distributions under the Incentive Plan to the Incentive Plan Participants. The Special Committee, comprised of the Company's independent director, evaluated a number of factors in making its recommendation, including: (i) the Directors' efforts in moving the Debtor through both the FDA and chapter 11 processes, recognizing that no investment banker was utilized, (ii) the specific terms and conditions of the Incentive Plan and the Incentive Plan Order, and (iii) the views of the Company's principal equity holders as well as the Equity Committee all of whom the Special Committee contacted. In addition, the Special Committee, retained a renowned expert in executive compensation, Mercer Consulting ("Mercer"), who independently analyzed not only the compensation contemplated by the Incentive Plan Order, but what an appropriate structure would be consistent with the Company's business judgment.

6.      After evaluating the above-stated factors, and seeking to further the best interests of the Company, the Special Committee has now recommended that the Incentive Plan Payments be made to the Directors. While the amounts are certainly less than that provided pursuant to the

Incentive Plan Order – or the amounts sought by the Directors – in the end, the Special Committee believes that the Incentive Plan Payments are fair and reasonable under the circumstances and align squarely with the interests of the Company, its Directors and its shareholders.

7.      To this end, it cannot be overlooked that the recommendations of a special committee are routinely upheld by Delaware courts. See Katell v. Morgan Stanley Group, 1995 Del. Ch. LEXIS 76, *19 (Del. Ch. 1995) (citing Kaplan v. Wyatt, Del. Supr., 499 A.2d 1184, 1189 (1989)) (finding that special litigation committee was independent body and thus upholding recommendation of such committee).  Delaware courts have concluded that, "[a] special committee is independent when it can base its decision on the merits of the issue rather than being governed by extraneous consideration or influences." Katell v. Morgan Stanley Group, 1995 Del. Ch. LEXIS 76 at *19 (citing Kaplan v. Wyatt, Del. Supr., 499 A.2d at 1189); Carlton Invs. v. TLC Beatrice Int'l Holdings, 1997 Del. Ch. LEXIS 86, *43-44 (Del. Ch. 1997) (finding no reason to question independence of special committee where strong career records present the probable justification for their appointment).  In sustaining the recommendation of a special committee, Delaware courts also look to the "overall impression of the Committee's good faith and the reasonableness of its investigation." See Katell v. Morgan Stanley Group, 1995 Del. Ch. LEXIS 76 at *26-27; Carlton Invs. v. TLC Beatrice Int'l Holdings, 1997 Del. Ch. LEXIS 86 at *47 (upholding special litigation committee's settlement recommendation where such committee performed "a good faith review and analysis of the factual and legal underpinnings of the claims.").

<u>**Relief Requested**</u>

8.     By this Motion, the Reorganized Debtor and the Special Committee respectfully request entry of an order, substantially in the form attached hereto as <u>Exhibit A</u>, authorizing the Debtor to distribute the Incentive Plan Payments to the Incentive Plan Participants.

**The Incentive Plan Payments Are Substantially Lower Than Those Provided by the Incentive Plan Order**

9.     At the outset, one of the critical factors examined by the Special Committee was the amount of the Incentive Plan Payments contemplated by the Incentive Plan Order. Indeed, the Special Committee concluded that the amounts they are seeking authority to pay, (a) cash in the aggregate amount of $7,500,000 and (b) $7,500,000 in restricted stock as described below, are substantially less than those that would be payable under the terms of the Incentive Plan Order and, indeed far less than the amounts requested by the Directors.[2]

10.     The Incentive Plan was based solely upon a percentage of (A) the gross proceeds of Asset Sales, both prior to and after FDA approval of OVA-1, and (B) the value of consideration – cash, debt and equity – <u>distributed</u> pursuant to a Confirmed Plan (the "<u>Qualified Transaction Proceeds</u>") (Incentive Plan Order ¶ 1) (emphasis added). As explained at the hearing, the Directors were heavily incentivized to deliver the greatest value to the stakeholders because "the percentages are higher based on the greater proceeds coming into the estate. So that to the extent more value comes in, the percentages are higher." (Transcript of June 22, 2009 Hearing Tr. at 5-6 "<u>June Hearing Tr.</u>"). In the end, the Incentive Plan Order provided that the Directors would receive: (i) zero, on Qualified Transaction Proceeds of $3 million or less, (ii)

---

[2]     While the Incentive Plan Participants are entitled to receive all of their Incentive Plan Payments in cash, they had voluntary agreed to cap the amount of cash they receive at $10 million, with the remainder to be paid in unrestricted stock. The independent analysis of the Incentive Plan conducted by the Special Committee similarly concluded that a cash/stock split was appropriate, however, at lower levels than that sought by the Directors, with certain restrictions placed on the stock.

6% on Qualified Transaction Proceeds of $3,000,001 to $10 million, and (iii) 8% on Qualified Transaction Proceeds of greater than $10 million.

11.    Specifically, as set forth in <u>Exhibit B</u>, the Special Committee calculated the value of consideration distributed pursuant to the Plan to be $229,122,546.  Applying this figure to the formula contained in the Incentive Plan confirms the following payments would be permitted under that plan, all in cash:

|  |  | Percentage | Value amount |  | Incentive Compensation |
|---|---|---|---|---|---|
|  |  |  |  |  |  |
| **Step 1** |  | **0%** | $3,000,000 |  | $           - |
|  |  |  |  |  |  |
| **Step 2** | **$3,000,000** | **6%** | $7,000,000 |  | $420,000 |
|  |  |  |  |  |  |
| **Step 3** | **$10,000,000** | **8%** | $219,122,546 |  | $17,529,804 |
|  |  |  |  |  |  |
| **Total:** |  |  | $229,122,546 |  | $17,949,804[3] |

12.    The Debtor and the Special Committee believe that that these calculations are clear and unambiguous.  Under the terms of the Incentive Plan, distributions in the form of cash, debt and equity were to be used in calculating the Qualified Transaction Proceeds.  Moreover, the Plan of Reorganization was clear in defining what was being "distributed" under the plan:

> any consideration received by any holder of an Allowed Claim or Allowed Equity Interest under the Plan, including without limitation, any Cash, debt, securities or any other property received by any holder of an Allowed Claim or Allowed Equity Interest, whether by way of Reinstatement of such holder's Allowed Claim or Allowed Equity Interest or otherwise.

(Plan Art. 1.1(34)).

This is consistent with the Incentive Plan Motion and Incentive Plan Order, both of which recognized that a "distribution" under a plan would include "cash, debt and equity."

---

[3]    For the purposes of this calculation, the Special Committee has <u>not</u> included as a "distribution" the $43 million in new equity that was raised.

13.    In the end, the clear and unambiguous language of the Incentive Plan Order

provides an appropriate foundation for the calculation of the Incentive Plan Payments.  See In re

Bridgeport Holdings, Inc., 326 B.R. 312, 327 (Bankr. D. Del. 2005) (holding that "clear and

unambiguous retention provisions" in plan documents were to be enforced); see also In re

Shenango Group Inc., 501 F.3d 338 (3d Cir. 2007) (holding that unambiguous obligations of

debtor were to be honored).

**The Special Committee's Independent Analysis Confirms That The Incentive Plan
Payments Should Be Made As An Exercise of the Debtor's Business Judgment**

14.    Despite the foregoing, upon emergence from chapter 11, the Company formed the

Special Committee to analyze independently the Incentive Plan Payments to ensure they were a

proper exercise of the Company's business judgment.  The business judgment rule is a series of

judicially created "presumption[s] that directors are acting independently, in good faith and with

due care in making a business decision."  See Brazen v. Bell Atlantic Corp., 695 A.2d 43, 49

(Del. 1997).  Indeed, the Delaware Court of Chancery has held that it is an "elementary precept

of corporation law" that "in the absence of facts showing self-dealing or improper motive, a

corporate officer or director is not legally responsible to the corporation for losses that may be

suffered as a result of a decision that an officer made or that directors authorized in good faith."

See Gagliardi v. Tri Foods Int'l, Inc., 683 A.2d 1049, 1051 (Del. Ch. 1996).

15.    To this end, it should not be overlooked that in entering the Incentive Plan Order,

the Court determined that the Debtor exercised sound business judgment in crafting the Incentive

Plan to compensate and motivate those individuals who play an integral role in managing the

Debtor's business.  (See June Hearing Tr. at 15-16) ("I find that the 'justified by the facts and

circumstances' criteria are met, which I view as more stringent than the 363 business judgment

test.  So having found justified by the facts and circumstances, clearly the Debtor has satisfied the 363 standard").

16.    In evaluating the Incentive Plan, the Special Committee took great pains to ensure that any award to the Directors was similarly in furtherance of the Company's business judgment.  For those reasons, the Special Committee placed considerable reliance upon the enormous benefits that the Directors had provided to the Company and that it would be in the best interests of the Company to incentivize them to stay with the Company in the future.  That is precisely why the Special Committee insists, and Mercer agrees, that the package must contain a restricted stock portion, vesting over time, to encourage the Directors to continue to lead the Company into the future.  As to why these Directors are so important to retain, the Special Committee noted that their past performance and leadership has been remarkable.  They served as the stewards for the Company when chapter 7 appeared the only option, and by sheer will and determination led the charge toward FDA approval of the OVA-1.  This team of highly skilled professionals, who worked without compensation,[4] drew from their vast career experiences in order to bring this goal of FDA approval to fruition.

17.    But FDA approval alone would not have been worth much if the Company locked cash and could not roll out the test.  Thus, also led by Gail Page, the Directors solved the Debtor's acute liquidity constraints, and provided enough post-petition liquidity to serve as a runway for the Debtor's emergence from chapter 11 once the OVA-1 received FDA approval.  And, once this was completed, the Directors next turned to negotiating the Plan and ensuring that each creditor was paid in full and that the interests of the equity holders were preserved.  Finally,

---

[4]    Ms. Page did receive consulting fees for separate services and a severance payment when she was terminated. The aggregate amount of these payments was less than $600,000.

the Directors were solely responsible for raising $43 million in new equity that was critical not only for the confirmation of the Plan, but more critically, the imminent rollout of OVA-1 into the market, and thus the future prospects of the company. The Directors were able to achieve all of this success in the worst economic climate since the Great Depression.

18.     It is highly relevant that the Directors accomplished each of these tasks without paying any investment banker commissions or fees. Indeed, the Court noted at the hearing approving the Incentive Plan Motion "that an investment banker has not been retained and the directors are, in effect acting as such…." (June Hearing Tr. at 15). In fact, the Incentive Plan provided a 100% credit for any amounts paid to an investment banker (Incentive Plan Order at ¶ 1), precisely because the Creditors Committee understood that investment banker type skills would be required to perform the tasks at hand and the Credtiors Committee did not want to pay the same fee twice.

19.     As the Court is well aware, investment bankers retained in comparable transactions will customarily obtain approval for three separate fees: a monthly fee, a financing fee and a restructuring or transaction fee, with, in some cases, certain crediting against the total compensation. By way of illustration, in somewhat comparable cases in this District, monthly fees range from $100,000 to $150,000 per month. The fees for consummating a chapter 11 plan of reorganization, generally referred to as a Restructuring Fee, Success Fee or Transaction Fee, can either be a flat fee or a percentage of consideration distributed pursuant to the plan. Comparable flat fees range from $1 million to $2 million, while the percentage fees are 1% to 5% of recoveries to creditors, including equity holders.[5] Finally, financing fees for new equity

---

[5]     Investment bankers retained in this District will commonly, as part of their restructuring or transaction fee, receive a percentage fee based upon the recovery to equity holders. See In re VeraSun Energy Corp., Case No. 08-12606 (BLS) (June 2, 2009) (approving retention of Rothschild, which provided that in calculating the M&A

(continued...)

raised generally range between 5% and 6%. While certainly no two chapter 11 matters are identical, simply applying comparable investment banking fees to the efforts of the Directors, who were, "in effect acting as such," could lead to total compensation ranging from $4 million to well in excess of $12 million.

20.     Of course, in none of the other chapter 11 matters did the investment bankers assume all of the risk of the engagement as did the Directors in this case. Moreover, as has been made clear, the Directors' responsibilities far exceeded those activities but typically engaged in by investment bankers; investment banking essentially was but, one component of their work. And finally, while investment bankers are generally protected by section 328 of the Bankruptcy Code in being paid their agreed-upon compensation if they complete their task, in this case the Debtor believes it more than appropriate for the Directors to receive their agreed-upon, court ordered compensation for a job done exceedingly well.

21.     In addition, as noted, the Special Committee authorized an independent analysis of the Incentive Compensation Plan by Mercer, one of the largest and most well-established employment and executive compensation firms in the world. The work completed by Mercer confirms that the Incentive Plan Payments are within the range of market incentive compensation for similar situations. Mercer reviewed the Incentive Plan Order, the factors surrounding the development of the Incentive Plan and data from several sources including: (i) aggregate key

---

(...continued)

Transaction Fee, "Aggregate Consideration shall include the fair market value of (i) the equity securities of the Company retained by the Company's security holders following the M&A Transaction...."); In re Hancock Fabrics, Inc., Case No. 07-10353 (BLS) (May 16, 2007) (approving Success Fee of, among other elements, "4% of the first $35 million in recoveries to holders of allowed equity claims, plus 5% of all additional recoveries to holders of allowed equity claims."). Indeed, the realities of any chapter 11 in today's economic climate is that any recovery to equity is unusual, and certainly the reinstatement of all of equity's economic and non-economic rights falls squarely within the definition of a "success."

employee incentive payments or "wind down" payments paid by several bankrupt companies to its employees to maximize the value of the bankrupt estate, (ii) equity grants on an individual and aggregate basis made by companies emerging from bankruptcy, (iii) total equity accumulation by senior executives pre-IPO of companies that have recently completed an initial public offering, (iv) aggregate fees received by investment banking firms in connection with raising capital for an entity, and (v) wealth accumulation by executives of highly successful companies based on the appreciation in value of the stock of those companies. Based on all of the data sources and its our experiences as executive compensation consultants, Mercer concluded, and advised the Special Committee, that the Incentive Plan Payments, as set forth in this Motion, are reasonable.

22. Finally, the Special Committee spent considerable time discussing the Incentive Plan Payments with the Debtor's largest equity holders; the parties that the Court rightfully recognized would bear the burden of these payments. The overwhelming consensus of these holders was that the Directors had done an exemplary job and created hundreds of millions of dollars of current and future value for the Company's shareholders. They similarly recognized not only the obligation, but the need to make these payments to assure that this talented team is incentivized to stay with the Company. The equity holders, however, generally favored reducing the cash compensation and increasing the equity compensation, and vesting the equity over time, all to incent further the Directors, particularly for Ms. Page to continue to stay with the Company and maximize value, which inures to the benefit of all Vermillion stakeholders.[6]

---

[6] In addition, the Special Committee also sought the input of the Equity Committee. While the Equity Committee had similar views concerning the services provided by the Directors, the enormous value created by their efforts and the need to provide a material payment to the Directors, they did not believe the amounts proposed by the Special Committee were appropriate.

23.     Based upon this critical feedback, the Special Committee would recommend the restructuring of the Incentive Plan Payments to provide that: (i) Gail Page would receive a $4.5 million cash bonus, plus $4.5 million in restricted stock 1/24th of which (7,563 shares) would vest each month beginning June 22, 2009 (the date of the Incentive Plan Order); and (ii) Jim Burns and John Hamilton would each receive a $1.5 million cash bonus, plus $1.5 million in restricted stock subject to the same vesting schedule (works out to approximately 2,521 shares per month).[7]

24.     As a result of the Directors' hard work and dedication to the success of the Debtor, the Debtor now (i) has the rights to an FDA approved test that could beneficially impact the lives of thousands of women; (ii) has partnered with the largest clinical lab in the United States to commercialize the OVA-1; and (iii) is a well financed company, capable of making all prepetition bankruptcy parties whole.  While each and every stakeholder of the Debtor has benefited by the Directors' efforts, the Debtor and the Special Committee also recognize that the Directors are critical for the ultimate success of Vermillion and that they must be incentivized to complete the tasks that lie ahead.  For all of these reasons, the Debtor and the Special Committee strongly believe that its decision to distribute the Incentive Plan Payments to the Directors in an amount and form that is less than what the Directors would be entitled to under the prior order, but is still appropriately significant in size, is a proper exercise of its business judgment.

**The Arguments of the Equity Committee are Unfounded**

25.     While the Special Committee believes that the payment of the Incentive Plan Payments are appropriate under the circumstances, the Special Committee has not overlooked

---

[7]     The stock will vest over a two year period with the number of shares calculated at the Effective Date price. Given that the restricted stock will continue to vest over the next 17 months and 3/4ths of it vests post-confirmation, awarding shares that vest post-confirmation is within  the Board of Director's powers as would be any other post-petition retention plan for directors, officers or employees.

the arguments of the Equity Committee. Indeed, as noted above, the Special Committee discussed its analysis with the Equity Committee, and shared the views of the Company's other substantial equity holders with them. Moreover, in examining these issues the Special Committee and the Debtor have evaluated the remaining concerns of the Equity Committee.[8]

26.     First, the Equity Committee appears to contend that it should now be permitted to re-litigate the Incentive Plan Motion because the voice of the equity holders was not heard in regard to this Motion. [Docket No. 269]. Second, the Equity Committee claims that the Debtor failed to calculate properly the amount of the Incentive Plan Payments. Finally, the Equity Committee appears to claim that even if the Debtor properly calculated the amount of the payments to the Directors, that amount is substantially greater than that contemplated by the Debtor and the other parties who negotiated the terms of the Incentive Plan. Each of these contentions of the Equity Committee is factually wrong or inapposite and not supported by the applicable law.

27.     As to the initial point, the Equity Committee is simply wrong that equity holders had no "seat at the table" during the negotiations that led the Court's approval of the Incentive Plan Motion. In fact, both the Creditors Committee and Quest "reached an accommodation with Vermillion with respect to this incentive plan." (June Hearing Tr. at 5). While these parties were

---

[8]     While the Debtor recognizes the Court's concern at the Confirmation Hearing that the Equity Committee speaks for all of the equity holders, the Debtor urges the Court to reconsider that view. First, the Special Committee's analysis, which is generally supported by the largest equity holders, is inconsistent with the Equity Committee's position. Second, federal courts have long recognized a policy that a stockholder cannot pursue a derivative action – which the Equity Committee's objection essentially amounts to – if it "does not fairly and adequately represent the interests of shareholders…who are similarly situated." Fed. R. Civ. P. 23.1(a). As a result, a prerequisite to derivative standing is that "the plaintiff was a shareholder or member at the time of the transaction complained of." Fed. R. Civ. P. 23.1(b)(1). Here, all Equity Committee members "bought into" this issue upon full disclosure to the market. They cannot be derivative plaintiffs, their fellow stakeholders do not agree with them, and their arguments should be rejected. Third, contrary to the Equity Committee's contention, those who directly negotiated this Incentive Plan had every incentive to "cap" the possible recoveries because those recoveries would at some level effect their equity position. Yet, they chose to incent the Directors to deliver the very results, which they did, and these creditors and stakeholders are quite pleased with the results.

creditors, they were also some of the largest shareholders of Vermillion.  Quest  beneficially held

approximately 1.3 million shares, or approximately 20% of the outstanding stock as of the June

hearing, and the holders of  the 7% Convertible Senior Notes due 2011, represented on the

committee by U.S. Bank National Association as Trustee, held more than 1 million shares of

common stock on a fully diluted basis, representing approximately 15% of the fully outstanding

shares at the time. ).[9]

      28.     Moreover, the Equity Committee effectively is claiming that it should now have

the opportunity to object to the Incentive Plan after (i) it has already been renegotiated by the

Debtor's largest stakeholders and the United States Trustee, (ii) it has been approved by the

Court, and (iii) most critically, the Directors have relied upon the Incentive Plan and delivered

truly unparalleled results for the direct and material benefit of the Company's equity, including

the members of the Equity Committee.  The only legal authority that could support this review is

Bankruptcy Rule 9024 and Federal Rule of Civil Procedure 60.  Based upon the applicable law,

however, they provide no basis for rejecting the Court's Incentive Plan Order.

      29.     "It is generally recognized that Federal Rule of Civil Procedure 60(b), made

applicable to bankruptcy cases by Bankruptcy Rule 9024, permits a bankruptcy court to vacate

an order which is otherwise entitled to preclusive effect." In re Sharon Steel Corp., 100 B.R. 767,

784 (W.D. Pa. 1989).  Federal Rule of Civil Procedure 60(b) provides in part as follows: "On

motion and upon such terms as are just, the court may relieve a party . . . from a final judgment,

order, or proceeding for the following reasons…(2) newly discovered evidence which by due

diligence could not have been discovered in time to move for a new trial under Rule 59(b)…or

---

[9]    The Equity Committee is correct, however, that none of its members participated in the review of the Incentive Plan because none of them purchased their stock until **after** FDA approval of the OVA-1, when the terms of the Incentive Plan were publically available.

(6) any other reason justifying relief from the operation of the judgment." Rule 60(b). "However, the party moving for relief bears a heavy burden." In re Sharon Steel Corp., 100 B.R. at 784 (W.D. Pa. 1989). "To prevail on a Rule 60(b) motion, the movant must demonstrate: (1) timeliness, (2) exceptional circumstances justifying relief, and (3) the absence of unfair prejudice to the opposing party." In re High Voltage Engineering Corp., 363 B.R. 8, 21 (Bankr. D. Mass. 2007) (citing Eastern Sav. Bank v. LaFata (In re LaFata), 344 B.R. 715, 723 (1st Cir. 2006)). In the Third Circuit, relief under Federal Rule 60(b) is "an extraordinary remedy and may be granted only upon a showing of exceptional circumstances." In re Sharon Steel Corp., 100 B.R. at 784 (citing In re Fine Paper Antitrust Litig., 840 F.2d 188, 194 (3rd Cir. 1988)). For these reasons, relief under Bankruptcy Rule 9024 and Rule 60(b) is infrequent within this Circuit. Id.

30.     Thus, to the extent the Equity Committee now seeks to challenge the Incentive Plan, it must do so under the standards set forth in Rule 60(b)(2) or Rule 60 (b)(6). To put it simply, the Equity Committee cannot establish that any "exceptional circumstances" exist that would justify such extraordinary relief. To this end, any argument of the Equity Committee that the amount of the Incentive Plan payments constitutes "newly discovered evidence" or in any way justifies relief from the Incentive Plan Order misses the mark. The Debtor, its principal stakeholders (including large shareholders) and the Directors negotiated an incentive plan that was approved by the Court. This plan provided for more substantial payments to the extent greater value was created for the Debtor and its stakeholders. (June Tr. at 5-6). There can be not even a suggestion that the Directors did not materially enhance the value for all stakeholders, including equity holders. Thus, any claim of "surprise" from payments directly tied to those results is simply incorrect.

31.     Moreover, any attempt to re-open the Incentive Plan Order simply overlooks the enormous prejudice to the Directors and potentially the Debtor. In re Modanlo, 413 B.R. 262, 265 (Bankr. D. Md. 2009) (denying movant's motion to vacate order in part for failing to show that there was no unfair prejudice to the non-moving party).  As noted above, the Directors relied upon the Incentive Plan Order and dedicated untold resources, with no salary, toward not only obtaining FDA approval for the OVA-1 and restructuring the Debtor, but as critically in preserving the now considerable value inherent in the Debtor's common stock.  They did so upon reliance of a court order that told them exactly how and under what circumstances they would get paid.  Moreover, relying on that order, Ms. Page turned down opportunities for other employment.  To now take away the benefit of that bargain is not only unduly prejudicial to the Directors, but could substantially prejudice the Debtor that is hoping to rely upon these same Directors to move the Company forward.

32.     As to the Equity Committee's factual challenges to the Incentive Plan Payments, again they find no support in the factual record, as indicated by the independent analysis of these payments conducted by the Special Committee.  The payments to which the Directors would have been entitled under the June order (which are significantly higher than what the Special Committee is authorizing) were calculated pursuant to the specific terms of the Incentive Plan, the Incentive Plan Order and the Plan, and any attempt to calculate these payments differently ex post would lead to a truly inequitable result.  While the Equity Committee argued at the Confirmation Hearing that reinstated equity is not a "distribution," the Plan provided exactly the opposite.  See supra ¶ 22.  Moreover, it defies logic that an incentive-based plan should give zero value to equity that increased in value by more than 200,000%, which is why the Incentive Plan itself says that the fee is a percentage of "the value of the consideration – cash, debt and equity."

And, in the end the Equity Committee's position is of no moment because of the critical fact that the Special Committee conducted its own independent analysis of Incentive Plan Payments.

33.     Finally, the Equity Committee's position that the amounts to be paid to the Directors are grossly beyond that contemplated by the parties is simply belied by the facts. First, the Incentive Plan contained no "cap" on its payments; rather as the Court acknowledged, this plan was "an incentive plan" for "achieving the goal of maximizing value, either through a reorganization or an assets sale." (June Hearing Tr. at 15). Thus, to the extent the Directors delivered greater value to the creditors and stakeholders – about which there is no question they did – they would be entitled to receive a larger incentive payment. That is all the Special Committee is seeking to do. Second, the original Incentive Plan was modified (before it was approved by the Court) such that the Directors would get no bonus if the sale were for too low of a price. It would be inequitable to have asked the Directors to assume the substantial downside risk and now deny their upside reward. And, it cannot be overlooked that not one of the parties on the Committee who negotiated the terms of the Incentive Plan (Creditors Committee members who remain large stockholders as well as Quest) has raised any issue with the payments that are contemplated to be made. Based upon these factors, and more critically the independent analysis of the Incentive Plan Payments by the Special Committee and the reduced total compensation and form of compensation for which it seeks approval, the arguments of the Equity Committee should be overruled.

## Effectiveness

34.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale or lease of property is stayed until the expiration of 10 days after entry of the order, unless the court orders otherwise." Given that the entry of an order approving this Motion is necessary to enable

the Debtor to satisfy its obligations under the Incentive Plan, the Debtor requests that any order approving the Motion be effective immediately.

## **Notice**

35.     Notice of this Motion has been provided to: (i) the Office of the United States Trustee; (ii) counsel to the Equity Committee; and (iii) all parties requesting notice under Bankruptcy Rule 2002.  In light of the nature of the relief requested, the Debtor submits that no further notice is necessary.

WHEREFORE, the Debtor respectfully requests that the Court enter an order, substantially in the form annexed as Exhibit A hereto, granting this Motion and such other and further relief as the Court deems just and proper.

Dated: February 26, 2010
       Wilmington, Delaware

Respectfully submitted,

    /s/ Thomas M. Horan
WOMBLE CARLYLE SANDRIDGE & RICE, PLLC
Francis A. Monaco, Jr. (DE Bar No. 2078)
Mark L. Desgrosseilliers (DE Bar No. 4083)
Thomas M. Horan (DE Bar No. 4641)
222 Delaware Avenue, Suite 1501
Wilmington, DE 19801
Telephone: (302) 252-4320
Facsimile: (302) 252-4330
Email: fmonaco@wcrs.com
Email: mdesgrosseilliers@wcsr.com
Email: thoran@wcsr.com

     -and-

Richard A. Chesley (IL 6240877)
Thomas L. Kent
PAUL, HASTINGS, JANOFSKY & WALKER LLP
191 North Wacker Drive, 30th Floor
Chicago, Illinois 60606
Telephone: (312) 499-6000
Facsimile: (312) 499-6100
Email: richardchesley@paulhastings.com

ATTORNEYS FOR REORGANIZED DEBTOR

**Exhibit A**

**(Proposed Order)**

## IN THE UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

---------------------------------------------------------------- x
|  |  |  |
| :--- | :--- | :--- |
|  | : | **Chapter 11** |
| **In re:** | : |  |
|  | : | **Case No. 09-11091 (CSS)** |
| **VERMILLION, INC.,**[1] | : |  |
|  | : |  |
| **Debtor.** | : | Re: Docket No.__ |
|  | : |  |

---------------------------------------------------------------- x

## ORDER GRANTING MOTION OF THE REORGANIZED DEBTOR BY AND THROUGH THE SPECIAL COMMITTEE FOR AN ORDER AUTHORIZING A REDUCED DISTRIBUTION UNDER THE MANAGEMENT INCENTIVE PLAN

This matter coming before the Court on the Motion (the "Motion")[2] of the Reorganized Debtor (the "Debtor"), by and through the Special Committee for an Order Pursuant to 11 U.S.C. §§ 105(a) and 363(b) and Federal Rule of Bankruptcy Procedure 6004 Authorizing Distribution Under the Management Incentive Plan; the Court, having reviewed the Motion and having scheduled a hearing before the Court (the "Hearing"); the Court having found that: (i) the Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, (ii) venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409, (iii) this is a core proceeding pursuant to 28 U.S.C. § 157(b) and (iv) notice of the Motion and the Hearing was sufficient under the circumstances; and after due deliberation the Court having determined that the relief requested in the Motion is necessary and essential for the Debtor's reorganization and such relief is in the best

---

[1]     The address of the Debtor's principal executive offices is 47350 Fremont Blvd., Fremont, California 94538. The Debtor's EIN is 33-0595156.

[2]     Capitalized terms not otherwise defined herein shall have the meanings given to them in the Motion.

interests of the Debtor, its estates and its creditors; and good and sufficient cause having been shown,

IT IS HEREBY ORDERED THAT:

1.      The Motion is GRANTED.

2.      The Debtor is hereby directed to distribute $ 7,500,000 in cash and $7,500,000 in restricted stock (as described in the Motion) in Incentive Plan Payments to the Incentive Plan Participants.  The Debtor is further authorized to take any and all actions necessary or appropriate in connection therewith, including, without limitation, the payment, when due, of all fees, charges, expenses, and indemnity claims required thereby.

3.      Notwithstanding the possible application of any rule under the Federal Rules of Bankruptcy Procedure, the terms and conditions of this Order shall be effective immediately and enforceable upon its entry.

4.      The Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.


Dated:  _____, 2010
        Wilmington, Delaware

        _____
        HONORABLE CHRISTOPHER S. SONTCHI
        UNITED STATES BANKRUPTCY JUDGE

# **Exhibit B**

## **(Director Incentive Plan Calculation)**

# Director Incentive Plan Calculation

Director incentive plan calculation is the sum of the value being received by the pre-money equity, unsecured claims and secured claims, which is being calculated as follows (using a $20 stock price as a place holder):

| Value component | Value Amount |
| --- | --- |
| Pre Money Shares | 7,918,705 |
| Closing Stock Price | $24.97* |
| Pre Money Market Cap | $196,304,697 |
| Secured Debt - Quest<br>accrued interest thru 1/7 | $7,000,000<br>$352,274 |
| Convertible Notes<br>accrued interest thru 1/7 | $7,365,000<br>$1,018,337 |
| Unsecured Liabilities | $6,021,365** |
| Value of outstanding<br>employee options | $5,043,088*** |
| Value of outstanding<br>warrants | $6,017,784**** |
| **Total Value** | **$229,122,546** |

\* Closing stock price value at January 7, 2010.
\*\* Total of unsecured non-debt claims, less administrative claims relating to the director incentive plan and obligations under the notes, determined/estimated at confirmation.
\*\*\* Value of outstanding eligible options using Black Scholes, a volatility of 50% and the closing share price of the common as of the confirmation of the Plan.
\*\*\*\* Value of the outstanding warrants using Black Scholes, a volatility of 50% and the closing share price of the common as of the confirmation of the Plan.